IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 13-62093-Civ-ZLOCH/HUNT

DAVID C. GOLDBERG

    Plaintiff,

v.

POINT BLANK ENTERPRISES, INC., a
Delaware corporation,

    Defendant.
_____/

## FIRST AMENDED COMPLAINT

Plaintiff, DAVID GOLDBERG ("Goldberg") files this First Amended Complaint, sues Defendant, POINT BLANK ENTERPRISES, INC. ("Point Blank" or the "Company"), and alleges as follows:

## GENERAL ALLEGATIONS

### *Introduction*

1. Goldberg was fired by Point Blank after he repeatedly objected to the Company's attempts to defraud the federal government in connection with a contract with the U.S. Army to manufacture concealable body armor for U.S. military troops.

2. Accordingly, this is an action for retaliation in violation of the False Claims Act, 31 U.S.C. §3730(h), as alleged in detail below.

### *The Parties, Jurisdiction, and Venue*

3. Plaintiff, David C. Goldberg, is a natural person domiciled in Broward County, Florida, and is otherwise *sui juris*.

4. Upon information and belief, Defendant, Point Blank, is a Delaware corporation with its principal place of business in Broward County, Florida.

5. This Court has subject matter jurisdiction over this controversy pursuant to 28 USC § 1331 because this is an action arising under the laws of the United States, specifically the False Claims Act.

6. Venue is proper in this judicial district under 28 U.S.C. §1391 because the Defendant transacts business here and the retaliatory acts giving rise to this Complaint occurred here.

### *History of Point Blank*

7. Point Blank Enterprises, Inc., f/k/a Point Blank Solutions, Inc. f/k/a DHB Industries Inc., has a history of engaging in fraudulent and criminal behavior.

8. In October 2007, the former CEO, David Brooks, was arrested for conducting an approximately $185 million fraud. Other officers of the company were indicted as well. **See Exhibit "1."**

9. Brooks was ultimately sentenced to 17 years in prison just two months ago, in August 2013. **See Exhibit "2."**

10. In approximately April 2010, the company was investigated by the Securities and Exchange Commission, was the subject of a shareholder lawsuit, and was spending approximately $600,000 a month on legal fees, which contributed to Point Blank Solutions, Inc. filing for bankruptcy protection. **See Exhibit "3."**

11. In February 2011, the Security and Exchange Commission filed fraud charges against the company and separately filed fraud charges against some of the company's former outside directors and audit committee members. **See Exhibit "4."** The charges against the

company alleged that the company had "engaged in pervasive accounting and disclosure fraud, and misappropriation of company assets that resulted in the company filing materially false and misleading periodic reports with the SEC." **See Exhibit "4."**

12. The company agreed to settle with the SEC and agreed to a permanent injunction from future violations. **See Exhibit "4."**

13. Point Blank Solutions, Inc. was purchased by an affiliate of Sun Capital Partners Inc. ("Sun Capital"), a Florida corporation, for approximately $36.6 million in late 2011. **See Exhibit "1."** The Company then began using the name Point Blank Enterprises, Inc., which is the name that the Company uses as of the date of this Complaint.

14. Sun Capital Partners structured its purchase of the Company in a manner that was designed to avoid the continued application of the permanent injunction once the purchase was complete.

15. In addition, according to the company's former Chief Operating Officer, Kenny Edwards, Edwards and Sam White (the Executive Vice President of both Point Blank Solutions, Inc. and Point Blank Enterprises, Inc.) caused the Company to hide certain finished products and materials when it exited bankruptcy in 2011.

16. Specifically, the Company had an existing pre-bankruptcy contract with Federal Prison Industries, a/k/a UNICOR, under which the Company had delivered certain finished products and materials to UNICOR before existing bankruptcy. Edwards and White (who is still employed by the Company today as its Executive Vice President) did this by manipulating the shipping and invoicing dates associated with those finished products and materials so it appeared that they were shipped post-bankruptcy, even though they had actually been shipped during the bankruptcy.

17. The purpose of those activities was to allow the Company's new owner, Sun Capital, to benefit from the monies that were associated with those finished products and materials rather than allow them to be collected by the Company during the bankruptcy proceeding.

18. Goldberg did not become aware that the Company's long history of fraudulent conduct was ongoing until recently, as discussed next.

### *Goldberg's Employment with Point Blank and the Government Contract*

19. Goldberg was hired by Point Blank on approximately May 12, 2012 as its Vice President of Program Management. His title was later changed to Vice President of Program Management and Contracts. His duties included business development and managing government contracts, including the one at issue in this case with the U.S. Army.

20. During Goldberg's employment, Point Blank was awarded an over $68 million government contract (the "Contract") for the procurement of concealable body armor vests and their outer covers to the U.S. Army. A portion of the Contract is attached hereto as **Exhibit "5."**[1]

21. Goldberg was the Company's point of contact with the government with respect to the Contract.

22. The Contract requires First Article Testing ("FAT"), which is a process in which the government performs testing on a set of sample vests prior to the production and before the

---

[1] Although the attachment indicates that the agreement is between the U.S. Army and "POINT BLANK BODY ARMOR INC", upon information and belief, there exists a subsequent amendment clarifying that the contract is between the U.S. Army and the Company. Only a portion of the Contract is attached because, among other reasons, it is voluminous. Goldberg obtained written authorization from the Contracting Officer assigned to the Contract before attaching a portion thereof to this Complaint.

purchase of the majority of vests under the Contract.  FAT is designed to ensure that the vests meet certain specifications and standards.

23. FAT is designed to ensure that a supplier can furnish a product that, among other things, conforms to all contract requirements for acceptance.  One of those requirements is that the First Articles be manufactured at an authorized specific location using specific approved materials.

24. The Defense Contract Management Agency ("DCMA") is the Department of Defense ("DoD") component that works directly with defense suppliers (such as Point Blank) to help ensure that DoD, Federal, and allied government supplies and services are delivered on time, at projected cost, and meet all specifications.

25. Pursuant to the Contract, inspection and acceptance of First Article Testing items is required to occur at the contractor's or an authorized subcontractor's facility by the DCMA.

26. After First Article Testing items are inspected and accepted as government property by the DCMA, pursuant to the Contract, they are then required to be shipped to the U.S. Army Aberdeen Testing Center for testing.

27. Pursuant to the Contract, the Company is to receive nearly $90,000 for the First Article samples after they pass DCMA initial inspection and are shipped to the U.S. Army Aberdeen Testing Center.

*The Company's Attempt to Defraud the Government*

28. Pursuant to the Contract, the Company was required to deliver numerous First Article Testing body armor and outer vests to the U.S. Army Aberdeen Testing Center by no later than 3:30pm on Monday, June 17, 2013.

29. To prepare for that shipment and pursuant to the requirements of the Contract, a DCMA Quality Assurance representative named Paul Lubowitz visited the Company on Friday, June 14, 2013 to conduct an inspection of the First Articles that the Company intended to ship to the government for First Article Testing.

30. Upon information and belief, Lubowitz inspected and approved the FAT articles for subsequent shipment to the government for First Article Testing. Earlier DCMA inspections had occurred on the vest's outer carriers at subcontractor facilities.

31. Those inspected and approved First Articles were originally scheduled to be shipped to the government at approximately 5 p.m. on Friday, June 14, 2013.

32. At 4 p.m. on Friday, June 14, 2013, an hour prior to the initially scheduled shipment time, the Company learned that the FAT samples that had been inspected and approved by the DCMA did not meet the requirements of the Contract or the government. **See Exhibit "6."**

33. Some of the FAT samples suffered from a dimensional problem, meaning they did not comply with the specifications required by the Contract.

34. When Goldberg was advised of this problem at approximately 4:45 p.m. on June 14, 2013, he called Major Scott Madore at the U.S. Army requesting a one-week extension to deliver the FAT samples.

35. The contracting officer assigned to oversee the contract was not in the office at that time, so no extension could be granted.

36. During the next 48 hours, numerous Company employees (not including Goldberg) worked over the weekend to replace the FAT samples that had already been inspected

by the DCMA and accepted as government property with substitute product in an attempt to conceal the defective nature of the First Articles the Company was required to ship.

37. This weekend effort included, among other things, contacting suppliers in Canada and California to get raw materials to place in the new FAT samples.[2] These were locations which were not authorized by the government to manufacture the First Articles.

38. The new FAT samples were never approved by the DCMA prior to their shipment to the U.S. Army Aberdeen Testing Center on Sunday, June 16, 2013 at approximately 1:30 p.m. To conceal this fact, the Company attached the DCMA inspection forms from the old, defective First Articles and attached them to the unauthorized substituted First Articles.

39. Upon information and belief, the Company represented to the government that the FAT samples the Company actually shipped were the ones that had been inspected and approved by the DCMA.

40. At least some of the Company employees involved in replacing the FAT samples and shipping them without DCMA acceptance knew what they were doing was wrong.

41. For example, just hours after shipping the replaced FAT samples, the Company's Vice President of Quality Control, Michael Sumner, sent an e-mail proposing ideas to Goldberg and the Company's Chief Operating Officer, Paulo Motoki, on what lie to tell the government to explain why it asked for an extension to provide FAT samples and was then able to ship product conforming to the Contract's specifications:

> What do we tell the Colonel now that we shipped.......maybe that someone questioned the square inches of coverage at the last minute and we had people spread out everywhere and could not easily double check so we erred on the side

---

[2] It is not presently known whether the use of Canadian products in the vests was a violation of the Berry Amendment (10 U.S.C. § 2533a), which requires Defense suppliers to give preference in procurement to domestically produced, manufactured, or home-grown products. The Contract does require the Company to comply with the Berry Amendment.

of safety and called him....we were then able to locate the proper Design personnel and had them to check it in the Accumark computer system and we were indeed good.....or any other ideas? We can let him know we do not need the extension after all and only provide an answer if asked why.

**See Exhibit "7."**

42. Although Goldberg did not know at the time that the replaced FAT samples had not been inspected by DCMA and was still piecing together the fraud that his colleagues were attempting to commit, he suggested that instead of lie, Sumner and Motoki tell the truth.

**See Exhibit "7."**

43. On Monday, June 17, 2013, the government e-mailed the Company asking why it had requested an extension of the FAT sample deadline, particularly since the FAT samples had shipped. **See Exhibit "8."**

44. Motoki responded on behalf of the Company (without copying Goldberg on his e-mail) and blatantly lied to the government by stating,

> For further clarification, after Point Blank final inspection and after DCMA final inspection, and during the final packing steps, a Point Blank employee brought to the management attention a concern on the size of the small vest. Because it was late on Friday, we stopped the shipment and immediately contacted Major Madore and request for an extension without any investigation.
>
> After further investigation, no incorrect findings occurred and therefore we shipped for on-time delivery.

**See Exhibit "8."**

45. Motoki also lied to the government in the same e-mail in response to numerous questions by the government. **See Exhibit "8."**

46. The DCMA was likewise interested in learning about the Company's request for an extension of time to deliver the FAT samples and specifically requested information from Goldberg about what had occurred.

8

47. Sumner ordered Goldberg not to respond to the DCMA.

48. At approximately 6:30 p.m. on Monday, June 17, 2013, Motoki phoned Goldberg and told him he needed to come up with a story that everyone else in the Company will support or the government would shut the Company down. Motoki told Goldberg that the Company could lose the $68 million Contract if the government were to learn about the Company's actions. Motoki tried to coerce Goldberg to lie by suggesting that Goldberg's employees would all lose their jobs if Goldberg would not lie for the Company since, if the government discovered his lies, the Company would no longer be able to do any business with the government.

49. Motoki was particularly concerned since there had previously been a Level III Corrective Action Request ("CAR") by the government with respect to the Contract. A Level III CAR is used by the government to, among other things, address a serious noncompliance or a significant deficiency. It requires a written response from the contractor and may result in the initiation of available contractual remedies.

50. By approximately 8 p.m. on June 17, 2013, Goldberg understood that Motoki, Sumner, and others were attempting to perpetrate a fraud on the government.

51. During the evening of June 17, 2013, Goldberg spoke with the Company's Chief Executive Officer, Daniel Gaston, about his beliefs that what the Company had done was illegal and wrong and that Goldberg would not participate in the fraud.

52. After he spoke with Gaston, Goldberg sent Gaston an e-mail explaining that earlier in the day, he did not understand that the replacement vests completed over the weekend had not been inspected by the DCMA before shipment. Goldberg said the Company needs to notify the government the next morning. **See Exhibit "9."**

53. On the morning of Tuesday, June 18, 2013, Sumner told Goldberg that he, Goldberg, and Motoki needed to have the same story to tell the government or they would all be fired.

54. Goldberg refused to go along with the Company's fraud and repeatedly insisted that the Company be truthful with the government.

55. Once it was clear that Goldberg would not remain quiet about the Company's fraud, Gaston told Goldberg he could no longer speak to the DCMA by himself.

56. Later on the morning of Tuesday, June 18, 2013, Goldberg met with Gaston, Sumner, Motoki, and another employee regarding the Company's response to the government. Goldberg suggested that the Company tell the whole truth to the government. The others decided that Sumner would send an e-mail to the government telling them that the product had actually been modified. Sumner's e-mail ultimately told the government that the product had been improved, which was not nearly the full truth. **See Exhibit "10."**

57. Notably, Sumner's e-mail to the government did not explain that the Company had actually replaced some of the FAT samples, nor did it explain that at least some of the FAT samples had not been inspected and accepted by the DCMA, as the paperwork that accompanied the substituted FAT samples suggested. It also did not explain that parts of the replacement vests were created at one or more unauthorized places of performance. **See Exhibit "10."**

58. Goldberg did not agree with Sumner's response and e-mailed the government letting them know that.

59. The government decided not to return the FAT samples and informed the Company that the DCMA was issuing a Level II Corrective Action Request (CAR), which is a

process that the DCMA uses to address contractual noncompliances and which requires a written response by the Company.

60.     On Wednesday, June 19, 2013, Sumner prepared a draft Corrective Action Documentation to respond to the DCMA's Corrective Action Request. In the draft Corrective Action Documentation, Sumner admits, among other things, to the following:

   a. "An error in judgment was made";
   b. The Company had some of the FAT sizes rebuilt after DCMA acceptance without government involvement, oversight, and additional product inspection and approval; and
   c. The Company did not communicate across all departments to all team members.

**See Exhibit "11."**

61.     Goldberg continued to object to the Company's handling of the incident, at times specifically telling Company officers that he believes that a fraud had been committed and that he may be forced to resign if the Company did not come completely clean with the government.

62.     Goldberg was scheduled to travel to Philadelphia for the Company on June 24th on an unrelated matter.

63.     On June 20, 2013, Goldberg sent an e-mail to Gaston explaining what he believed to be Gaston's inadequate response to the entire incident and Goldberg's belief that Gaston was protecting Motoki, who had very clearly lied to the government in e-mail correspondence. Goldberg also requested Gaston's resignation.

64.     On June 21, 2013, Gaston told Goldberg, without explanation, that Goldberg would not be going to Philadelphia.

65. On June 22, 2013, at a time when Goldberg had still not seen the Company come clean with the government and when the Company had not taken any action against anyone who had clearly lied to the government, Goldberg sent some e-mail correspondence indicating that he was considering resigning from the Company.

66. Goldberg never actually resigned from the Company.

67. On June 24, 2013, at 12:14 p.m., Goldberg sent an e-mail to Tim Stubbs, a representative of Sun Capital Partners, Inc., which owns the Company. In that e-mail, Goldberg states:

> As you know I have alleged that Daniel Gaston, Sam White, Paulo Motoki, Michael Sumner and Shelby Carpenter have engaged in fraud and conspiracy. Despite earlier indications I plan to resign over this issue please be advised I have reconsidered as I have done nothing wrong in regards to this FoCBA matter. I request a call with you in the next 24 hours. Kindly provide a time and call in number to discuss.

**See Exhibit "12."**

68. Within the next 40 minutes, Goldberg received a phone call from the Company's Human Resources Director and the Chief Financial Officer telling him that he is "disruptive" and that the Company is accepting his resignation.

69. Although Goldberg's access to the Company's e-mail system was revoked almost immediately, Goldberg did send an e-mail at June 24, 2013, at 12:56 p.m., immediately following the above phone call, in which he explained that he had not tendered his resignation.
**See Exhibit "13."**

70. The Company proceeded with firing Goldberg despite his explanation that he had not tendered his resignation.

## COUNT I
### (Retaliation in Violation of the False Claims Act, 31 U.S.C. § 3730(h))

71.     Goldberg realleges paragraphs 3 through 70 above as if fully set forth herein.

72.     Goldberg engaged in protected activity when he investigated Company actions that were defrauding the government and when he repeatedly objected to, opposed, and complained to numerous Company employees, including the CEO, about the fraud that the Company was perpetrating.  Goldberg also submitted a complaint to the DCMA fraud hotline, which the Company learned about before terminating him.

73.     Based on the facts known to Goldberg after the Company sent First Articles to the government that had not been manufactured in authorized places of performance and which had not been inspected and accepted by the DCMA, Goldberg's investigatory activities could reasonably have led to a viable False Claims Act action.

74.     A reasonable employee in the same or similar circumstances as Goldberg would have believed in good faith that Point Blank was defrauding the government.

75.     A reasonable employee in the same or similar circumstances as Goldberg would have believed that the Company had presented a "false claim for payment" to the government by shipping the First Articles that had not been approved or inspected by DCMA.

76.     The Company was aware of Goldberg's protected activities because Goldberg objected both verbally and in writing to the Chief Executive Officer as well as other officers of the Company and to the Company's owner, Sun Capital.

77.     Within a week after Goldberg engaged in protected activity, the Company retaliated against Goldberg by terminating him.  This retaliation was motivated solely by Goldberg's allegedly "disruptive" protected activity.

78. Goldberg would not have been terminated if he had not engaged in the protected activities.

WHEREFORE, Goldberg requests judgment in his favor and that he be awarded the following relief from Point Blank:

a. Full front pay and benefits;

b. Economic damages for lost wages and benefits, including two times the amount of back pay, interest on back pay, and compensation for special damages sustained as a result of the retaliation;

c. Compensatory (non-economic) damages, including but not limited to damages for emotional distress and injury to his reputation;

d. Experts' fees, attorneys' fees, and costs; and

e. Such other relief that the court may deem just and proper.

## JURY TRIAL DEMAND

Goldberg demands a jury trial on all claims so triable.

Respectfully Submitted,

By: */s/ Harris S. Nizel*
SCOTT W. ATHERTON
Florida Bar No. 0749591
scott@athertonlg.com
HARRIS S. NIZEL
Florida Bar No. 807931
harris@athertonlg.com
**ATHERTON LAW GROUP, P.A.**
224 Datura Street, Suite 815
West Palm Beach, Florida 33401
Telephone:   561-293-2530
Facsimile:   561-293-2593

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 14, 2013, the foregoing document is being served this day on POINT BLANK ENTERPRISES, INC. via U.S. Mail to its registered agent.

By: */s/ Harris S. Nizel*
HARRIS S. NIZEL
Florida Bar No. 807931